

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-2007

# Foxworth v. PA State Pol

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5571

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Foxworth v. PA State Pol" (2007). *2007 Decisions.* Paper 1691.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1691

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-5571

RODERICK FOXWORTH, JR.,

Appellant

v.

PENNSYLVANIA STATE POLICE; TERRY MCELENY;
STEVEN M. MCDANIELS; LINDA M. BONNEY;
JEFFREY MILLER

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 03-cv-06795)
District Judge: Honorable Michael M. Baylson

Submitted Under Third Circuit LAR 34.1(a)
January 16, 2007

Before: McKEE, AMBRO and STAPLETON, <u>Circuit Judges</u>

(Opinion filed February 1, 2007)

OPINION

AMBRO, <u>Circuit Judge</u>

Roderick Foxworth appeals the District Court's rejection of his employment

discrimination claim. For the reasons set forth below, we affirm.

## I.

We mention only the facts relevant to our decision. Foxworth is a black male who applied for a state trooper position with the Pennsylvania State Police (PSP). After scoring well on the qualifying exam, he was given a conditional job offer. In part, the offer was subject to the PSP's written policy requiring automatic disqualification of cadet candidates with prior "criminal conviction[s]" or certain acts of "criminal misbehavior."

The police background check of Foxworth's criminal history returned satisfactory results. But his answers to the application questionnaire did not. The questionnaire asked him to answer whether he had "ever had a record expunged" and to "list details of any criminal charges or activity alleged or engaged in." Foxworth answered "yes" to the expungement question and explained that he had stolen $4,000 from a former employer in 1998. When the police arrested him for the theft, he admitted to the crime, and—as a first-time offender—was entered into a program whereby his record was expunged after he successfully completed a two-year probationary period.[1] Foxworth offered the same information in the "Polygraph Screening Booklet," which informed applicants about automatic disqualifying factors. Upon reading his application and at the direction of the Director of Employment Services at the PSP, one of the troopers informed Foxworth that he would be disqualified from the position because of the 1998 theft and advised him to

---

[1] The program is called "Accelerated Rehabilitative Disposition" or "ARD."

withdraw his application or face disqualification from all other state trooper positions.

Foxworth withdrew. But he challenged the decision in federal district court with two claims under 42 U.S.C. § 1983.[2] He claimed that the PSP infringed on his Fourteenth Amendment rights to substantive and procedural due process, as well as equal protection, because the automatic disqualification procedure was improper both facially and as applied to him. Under Title VII of the Civil Rights Act of 1964 he alleged that, because of his race, the PSP discriminated against him in the cadet hiring process. The District Court granted the PSP summary judgment on all of Foxworth's claims. He filed a motion for reconsideration, and the District Court denied it.

Foxworth appeals to us, reasserting two claims and raising a third. He argues that the District Court erred in granting summary judgment to the defendants with respect to the § 1983 procedural due process claim and the Title VII employment discrimination claim; he also contends that the Court erred in denying reconsideration of the summary judgment order.[3]

---

[2] Foxworth also advanced a third race discrimination claim pursuant to 42 U.S.C. § 1981, but the Court treated this count as merged into the § 1983 claims.

[3] The District Court had subject matter jurisdiction under Title VII, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary, and we apply the same standard the Court should have applied. *See, e.g.*, *Slagle v. County of Clarion*, 435 F.3d 262, 263 (3d Cir. 2006). Namely, a grant of summary judgment is proper where, viewing the facts in the light most favorable to the non-moving party, that party has established that there is no genuine dispute of material fact and "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

## II.

As for his procedural due process claim, Foxworth argues that he had a state-conferred property interest in being hired by the PSP. To prevail, he must demonstrate that the PSP deprived him of a state-sponsored property entitlement without first providing him with the requisite level of process. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 & n.2 (1972). Accordingly, we begin by inquiring whether a property interest existed. "To have a property interest in a job[,] . . . a person must have more than a unilateral expectation of continued employment; rather, he must have a legitimate entitlement to such continued employment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (citations omitted). Whether such a claim exists is determined by state law. *Id.*

Under Pennsylvania law, public employees are employees at-will, with no protected property interest in their employment unless the state legislature specifically creates one. *Hill*, 455 F.3d at 234; *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005); *Davenport v. Reed*, 785 A.2d 1058, 1063 (Pa. Cmwlth. 2001). The law makes clear that cadet candidates have no property interest in trooper or police positions. *See Anderson v. City of Phila.*, 845 F.2d 1216, 1221 (3d Cir. 1988) (city police applicant); *Snisky v. Pa. State Police*, 799 A.2d 961, 964 (Pa. Cmwlth. 2002) (state police cadet candidate).

---

To prevail on a motion for summary judgment, the non-moving party needs to set out specific facts showing a genuine issue of fact for trial. *See* Fed. R. Civ. P. 56(e). We will only reach the challenge to the denial of the motion to reconsider if we find Foxworth's claims to be meritorious.

Notwithstanding this general rule, Foxworth argues that 18 Pa. Const. Stat. §§ 9124 and 9125 create a property interest in the job he sought. Both provisions are off point. Section 9124 prohibits government agencies from denying an "application for a license, certificate, registration or permit" where there has been no conviction or on the basis of annulled or expunged convictions. 18 Pa. Const. Stat. § 9124.[4] Under Pennsylvania caselaw, § 9124 applies only to government *licensing* agencies. *See, e.g.,*

[4] The provision reads in part as follows:

> § 9124. Use of records by licensing agencies
>
> (a) State agencies.—Except as provided by this chapter, a board, commission or department of the Commonwealth, when determining eligibility for licensing, certification, registration or permission to engage in a trade, profession or occupation, may consider convictions of the applicant of crimes but the convictions shall not preclude the issuance of a license, certificate, registration or permit.
>
> (b) Prohibited use of information.—The following information shall not be used in consideration of an application for a license, certificate, registration or permit:
>> (1) Records of arrest if there is no conviction of a crime based on the arrest.
>> (2) Convictions which have been annulled or expunged.
>> (3) Convictions of a summary offense.
>> (4) Convictions for which the individual has received a pardon from the Governor.
>> (5) Convictions which do not relate to the applicant's suitability for the license, certificate, registration or permit.
>
> (c) State action authorized.—Boards, commissions or departments of the Commonwealth authorized to license, certify, register or permit the practice of trades, occupations or professions may refuse to grant or renew, or may suspend or revoke any license, certificate, registration or permit for the following causes:
>> (1) Where the applicant has been convicted of a felony.
>> (2) Where the applicant has been convicted of a misdemeanor which relates to the trade, occupation or profession for which the license, certificate, registration or permit is sought.

*Schmidt v. Deutsch Larrimore Farnish & Anderson*, 876 A.2d 1044, 1047 (Pa. Super. 2005). This provision does not apply to police agencies because trooper applicants like Foxworth do not apply for licenses. *See Poliskiewicz v. East Stroudsburg Univ.*, 536 A.2d 472, 474 (Pa. Cmwlth. 1988). Moreover, there is no property entitlement here because trooper applicants cannot legitimately expect ARD expungements to remain private and unavailable to the police. *See Schmidt*, 876 A.2d at 1048 ("[W]hile the formal criminal history record information that is compiled by state criminal justice agencies indeed constitutes private facts, the fact of an arrest . . . does not."); *see also Puricelli v. Borough of Morrisville*, 820 F. Supp. 908, 918 (E.D. Pa.1993) ("[E]ven where an arrest record has been expunged, it still remains on court records and in police blotters, and, it never truly is removed from the public record, thus it is not entitled to privacy protection.").

Section 9125 limits employers' use of information about an applicant's criminal history files "only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied." 18 Pa. Const. Stat. § 9125.[5] It is

---

[5] This provision states in relevant part:

§ 9125. Use of records for employment

(a) General rule.—Whenever an employer is in receipt of information which is part of an employment applicant's criminal history record information file, it may use that information for the purpose of deciding whether or not to hire the applicant, only in accordance with this section.

(b) Use of information.—Felony and misdemeanor convictions may be considered

true, as Foxworth contends, that this section allows employers to consider, when relevant in hiring decisions, convictions but not arrests. *Tilson v. School Dist. Of Phila.*, Civ. A. No. 89-1923, 1990 WL 98932, at *4 (E.D. Pa. July 13, 1990), *aff'd*, 932 F.2d 961 (3d Cir. 1991). However, as the District Court noted, the statute and its limitation relate to an "employment applicant's *criminal history record information file*." 18 Pa. Const. Stat. § 9125 (emphasis added). Foxworth's case was expunged from his file, but the PSP obtained its information from Foxworth himself on the application, not from its criminal history background check, which came up clean. The record indicates that a PSP trooper advised him to withdraw his application because of the prior "criminal misbehavior" he listed on the application, not because of any prior arrest from his file.

Foxworth further claims that *Cisco v. United Parcel Serv., Inc.*, 476 A.2d 1340 (Pa. Super. 1984), interpreted § 9125 to mean that employers may not consider criminal behavior in the hiring process. Yet, the *Cisco* Court *affirmed* the dismissal of an employee who was arrested but not convicted for stealing because of the nature of the delivery job. *Id.* at 1344. ("[J]obs are lost when the employer, for a legitimate business reason, cannot risk even someone under suspicion of having committed theft and trespass when the nature of its business is to enter onto the premises of others and to deliver parcels which belong to them."). *Cisco* therefore does not aid Foxworth's attempt to convince us to reverse. Furthermore, it proves similarly unhelpful to his claims in our

---

by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied.

assessment whether the PSP's policy arose from a legitimate business necessity (as discussed below with respect to the disparate impact claim).

In sum, neither § 9124 nor § 9125 confer a property interest that the PSP violated here. Moreover, these statutes place limits on licensing agencies and other employers with respect to criminal history files, but do not prohibit employers from considering criminal misbehavior as disclosed on an application. Without a property right to employment with the PSP, Anderson has no basis for a procedural due process claim.

**III.**

Foxworth also alleges that the Court erred by granting summary judgment to defendants on his disparate impact and disparate treatment claims. Under Title VII, an employer cannot "fail or refuse to hire . . . any individual, or otherwise [] discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). Also under Title VII, a plaintiff can establish a *prima facie* case of disparate impact by demonstrating that facially neutral hiring policies have a disparate impact on a protected class of people, that is, that they "are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quotations omitted); *see also Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–646 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991,

8

§ 105, 42 U.S.C. § 2000e-2(k).  To meet this burden, it is not enough for a plaintiff to show "that there are statistical disparities in the employer's workforce;" rather a plaintiff must also prove causation,

> that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . [ and] statistical disparities must be sufficiently substantial that they raise such an inference of causation.

*Watson v. Fort Worth Bank & Trust*, 477 U.S. 977, 994–95 (1988).

If a plaintiff is able to establish a *prima facie* case, the burden shifts to the employer to show that the employment practice is "job related for the position in question and consistent with business necessity. . . ."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Should the employer meet this burden, a plaintiff may still prevail if he or she can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

Foxworth presented three pieces of statistical evidence to establish a *prima facie* case of disparate impact: (1) a "Work Force Analysis 2005 Summary," which shows low percentages of blacks among both civilian and trooper employees; (2) an "Incumbency v. Estimated Availability 2005 PSP Detail" survey, showing an incumbency percentage of 6.94 blacks against an availability percentage of 13.82 as indication of a racial disparity in hiring practices and a demonstration of adverse effect of the automatic disqualification

9

procedure; and (3) the deposition of PSP Director of Human Services Linda Bonney, who stated that the percentage of black recruits had decreased from 13% to 2–3% since the Bolden Consent Decree[6] ended in 1999 and the automatic disqualification policy began in 1997.

The District Court acknowledged that Foxworth's statistics showed a disparity, but concluded that they were insufficient as a matter of law to prove that the automatic disqualification policy caused it. Moreover, it observed, the statistics showed a disparity among the police force and staff, but failed to reveal information specific to cadet applicants. The Court went on to state that even if Foxworth could point to a causal link between the policy and the disparity, the policy likely would meet the requirements of a business necessity justification under caselaw. It cited *Clinkscale v. City of Phila.*, No. 97-2165, 1998 WL 372138 (E.D. Pa. June 16, 1998), where a plaintiff, who had been acquitted for assaulting a police officer and had his record expunged, challenged the Philadelphia Police Department's policy of excluding applicants on the basis of prior arrests without convictions on a Title VII disparate impact claim. Similar to the *Cisco* Court, the *Clinkscale* Court granted summary judgment to the Police Department on the ground that the practice was justified by business necessity. *Id.* at *1–2. Comparing *Clinkscale* to Foxworth's case, the District Court determined that the disqualification

_____

[6] The Bolden Consent Decree was the result of a class action suit against the PSP in 1977. The Decree instituted measures to redress the dearth of African American cadets being recruited by the PSP.

10

factors would serve important business purposes: ensuring public safety and respect for the law.

We agree with the Court's analysis. Moreover, we note that to raise an inference that the disqualification procedure causes racial disparity among the cadet pool, Foxworth needed to demonstrate at a minimum that there is an actual disparity among cadets and compare pre-1997 figures (when the PSP instituted the disqualification procedures) to post-1997 figures for cadet hiring. Alternatively, under *Albemarle Paper Co.*, he could have argued that an alternative employment practice has a less disparate effect that would serve the PSP's legitimate business interest in a non-discriminatory way. He has not done so.

As for Foxworth's disparate treatment claim, we apply the familiar *McDonnell-Douglas* burden-shifting framework by which Foxworth must make out a *prima facie* case of discrimination. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). This framework requires a showing that Foxworth (a) was a member of a protected class, (b) was qualified for the trooper position, and (c) another, not in the protected class, was treated more favorably. *See id.* at 802–03. If Foxworth is able to establish a *prima facie* case, the burden shifts to the PSP to identify a legitimate, non-discriminatory reason for failing to hire him. *Id.* at 804–05. If it is able to do so, Foxworth can still prevail—or at least defeat summary judgment—if he can point to evidence that may raise the inference that the PSP's reasoning is pretext for actual discriminatory motive. *Id.*; *see also Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *St. Mary's Center v. Hicks*, 509 U.S. 502, 506–07(1993); *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

At the *prima facie* stage, the parties only dispute the second prong: whether Foxworth was qualified for the trooper position. We have held recently that an employer that departs from a job posting's objective criteria in making an employment decision thereby establishes different criteria against which subsequent applicants should be measured for the position. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005); *see also Scheidemantle v. Slippery Rock University State System*, 470 F.3d 535, 539 (3d Cir. 2006). Thus, if Anderson can demonstrate that a "similarly 'unqualified' cadet" not from his protected class obtained a cadet position notwithstanding prior criminal behavior, he can make out a *prima facie* case and will defeat summary judgment. *See Scheidemantle*, 470 F.3d at 542.

Foxworth argues that he makes out a *prima facie* case of discrimination because the PSP hired a white candidate in 1995 who had an extensive record of sexual and racial improprieties while at the police training institute in Illinois, for which he was eventually dismissed. Indeed, the PSP would have established different criteria by which it should have reviewed Foxworth's application had it knowingly hired that cadet notwithstanding his improprieties and dismissal. However, the cadet did not disclose his prior misconduct on his application, and the PSP did not hire him with the knowledge that he failed to meet

its qualification standards. We cannot therefore conclude that the PSP applied a lower standard to the white candidate than to Foxworth such that he can make out a *prima facie* case on that basis.

But even if he did, we would be hard pressed to conclude that evidence of the 1995 hire raised the inference that the PSP's proffered motive—application of the neutral automatic disqualification policy—was mere pretext. To make a showing of pretext, Foxworth would have to point "to some evidence, direct or circumstantial, from which a fact-finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [the employer's] action." *See Sheridan v. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Foxworth bears the burden of proving that similarly situated persons were treated differently. *Burdine*, 450 U.S. at 258; *Simpson v. Kay Jewelers*, 142 F.3d 639, 645–46 (3d Cir. 1998).

In this case, the 1995 hire occurred before the imposition of the 1997 automatic disqualification policy, and the 1995 hire resulted from false statements on the application that would not lead a reasonable fact-finder to conclude that the PSP failed to apply its policy neutrally. In addition, the PSP's policy has since disqualified both whites and non-whites; out of the forty-three disqualifications and withdrawals in Foxworth's applicant pool, forty-one applicants were white and two were black. Foxworth's argument that his

case is unique because of the ARD expungement does not help him meet his comparative burden. The *Simpson* Court held that "even if Simpson [were] similarly situated to [another white employee] but treated less favorably, . . . [his] reliance on a single member of the non-protected class is insufficient to give rise to an inference of discrimination when [he] was treated the same as thirty-four members of the non-protected class." 142 F.3d at 645–46. Under *Simpson*, in light of the fact that forty-one non-protected applicants were treated similarly to Foxworth, the fact that he singles out one case that is marginally analogous to his automatic disqualification is not enough to raise the inference of pretext.

## IV.

In conclusion, Foxworth has no property right to future employment with the PSP that would allow him to prevail on a procedural due process claim against the automatic disqualification procedure. Nor has he advanced sufficient evidence to make out a claim of discrimination on either a disparate impact or a disparate treatment theory. Viewed in the light most favorable to Foxworth, the record evidence indicates that racial disparities in the Pennsylvania State Police persist. But it does not suffice to draw a link between that disparity and the automatic disqualification policy either facially or as applied to Foxworth. We therefore affirm.

14